### ELLIOTT CO. v. LAGONDA MFG. CO.

(Circuit Court of Appeals, Third Circuit. January 28, 1916.)

No. 1962.

1. PATENTS ⚙➾328—VALIDITY AND INFRINGEMENT—TURBINE.

The Elliott & Faber patent, No. 874,174, for a turbine for use in operating a boiler tube cleaner, and No. 983,032, for a modification thereof, granted to the same patentees on a divisional application, which relate especially to the casing or shell inclosing the motor, disclose invention and are valid; also *held* infringed.

2. PATENTS ⚙➾328—VALIDITY AND INFRINGEMENT—ROTARY MOTOR.

The Elliott patent, No. 983,034, for a rotary air motor for operating a boiler tube cleaner, is for a structure which is novel and useful, and involves invention; also *held* infringed.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by the Elliott Company against the Lagonda Manufacturing Company. Decree for defendant, and complainant appeals. Reversed.

For opinion below, see 222 Fed. 946.

Bakewell & Byrnes, Clarence P. Byrnes, and George H. Parmelee, all of Pittsburgh, Pa., for appellant.

Staley & Bowman, Paul A. Staley, and Percy Norton, all of Springfield, Ohio, for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. This appeal involves the validity and infringement of certain claims of three several patents, viz.: No. 874,174, granted December 17, 1907, to W. S. Elliott and F. M. Faber, for a turbine; No. 983,032, granted January 31, 1911, to said W. S. Elliott and F. M. Faber, for a turbine; and No. 983,034, granted January 31, 1911, to said W. S. Elliott, for a motor. At an earlier stage of this case the District Court, in an opinion reported at 205 Fed. 152, held the defendants were estopped by a certain license agreement from

⚙➾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

contesting the validity of such patents, and accordingly entered a decree adjudging them valid. On review by this court (214 Fed. 578, —— C. C. A. ——) it was held the defendants were not estopped, and the cause was remanded to the District Court to receive proofs on the subject of validity. This was done, and on final hearing that court filed an opinion reported at 222 Fed. 946, and entered a decree dismissing the bill. Thereupon this appeal was taken.

[1] These patents concern tube cleaner motors, which travel through boiler tubes and cut and remove the stonelike crust which forms in such tubes by the action of heat on the mineral salts contained in the water. This layer lessens steam space and increases fuel consumption. In a general way it may be said such appliances consisted of a turbine of smaller diameter than the tube and actuated by water passing through a hose to which the turbine was connected. To the shaft of such turbine is attached a revoluble, toothed, swing arm, which delivers rapid blows and cuts out the scale, and which, by reason of its universal joint attachment to the shaft, is enabled to follow the bonds and curves of the tube. Without entering into detail, it suffices to say that motor tube cleaners went into general use and proved a very considerable stimulus to the use of water tube boilers. Their use, however, when applied to heavy scale, developed certain weaknesses, due to the very high speed at which they ran and to the heavy longitudinal thrusts to which the machine was liable. The proofs show the unusual strains and vibrations to which this necessarily small mechanism was subjected. In that regard the testimony is:

"The cutting head attached to the motors strikes blows in rapid succession against the scale within the tubes. The speed of say a four-inch machine—water driven—when running empty with 150 pounds pressure of water will develop a speed of 10,000 to 12,000 revolutions per minute. When running loaded, the speed will be inversely as the load, dropping as low as 2,000 to 2,500 revolutions per minute. One of our four-inch turbines, with 150 pounds working pressure, will develop from 3 to 3½ horse power, as shown by brake tests. When developing this amount of power the speed is in the neighborhood of from 4,000 to 5,000 revolutions per minute, depending upon the type of the machine. When these machines are connected with the drill through the universal coupling, from actual observation the drill strikes from two to three blows every revolution. As action and reaction are equal, this blow is transmitted to the universal coupling, and thence to the shaft in the motor—the universal coupling acting in a measure to lighten the reaction against the shaft. Combined with the hammer blow there is a torsional resistance transmitted to the shaft, on account of the scale in the tube being indented by the hammer blow. The hammer blow of the tool cuts into the scale, which has a tendency to lock the tool within the groove so cut, thereby causing a resistance, preventing the machine from turning, and the inertia of the moving parts, combined with the pressure on the wheel due to the water, breaks away these grooves, and in doing so creates an enormous torque momentarily. Assuming that the machine is in operation in a fairly heavily scaled tube, using the drill as the cutting head, these momentary vibrations, due to the cutting of the tool into the scale, are equal to from 10,000 to 30,000 vibrations per minute, depending upon the speed. Again, when the tool strikes against a heavy projection of the scale, if the scale is hard, it frequently stops the machine instantly, so that the power developed by the machine during this instance might be several times the capacity of the machine in the way of normally developed power, because the energy due to the inertia of the moving parts is overcome by the projection of the scale; as well as the

energy given the machine by the water pressure back of it. In view of these conditions, it is a pretty difficult matter to state to what extent this vibration exists, but we have had a great many cases where the three-quarter inch shaft had been broken or twisted off, due to the momentary stopping of the machine, which reacts against the moving parts."

The proofs further show that numerous constructions, covering several years of experimentation, failed to discover any means of overcoming these difficulties. The small area to which the motor was restricted, the high speed necessary to successful use, and the rapid and powerful thrust to which its parts were subjected, made the construction of a motor fitted to remove heavy scale a very difficult problem. In the art as developed up to the time of the motor patent here in suit, ball bearings had been used to minimize friction, and multi-part shells, united by threads and screws, employed. Both these features, viz., ball bearings and screw-connected parts, were elements of weakness. In ball bearings it was the wear incident to the constrained use of small-sized balls, and that the ball-bearing supports were unscrewed by the excessive vibrations. So, also, the threads and screws uniting the shell or tube and the interior bearings worked loose under vibrating strains. These experiments covered more than two years. A number of machines for heavy work were built and proved failures, and as a result the radical departure from prior methods was resorted to of wholly discarding both multi-part shells and ball bearings. This move finally terminated in a solid shell, with integral webbing, in which the shaft was provided with a long bearing. The solid shell obviated multi-part separation, and the long bearing spread the shafts thrust and dispensed with ball bearings. That this motor was not a mere obvious, mechanical step, but was the gradually approaching evolution which came from much experiment and numerous failures, is shown by the proofs. As illustrative of this we quote from the testimony bearing upon the relation of the shell to the water supply, which was but one of the numerous factors to which due regard had to be given. In that regard Elliott, one of the patentees, testified:

"The development of this machine resulted in our using a rear and front bearing, and I remember distinctly the discussions that we had and the difficulties encountered in the designing of a suitable front bearing to withstand the vibrations. From our experience in the past we fully realized the importance of making a machine out of one piece, in order to resist the vibratory effect of the cutting heads; but the trouble was to get rid of the water, as the efficiency of a turbine is very largely affected by the velocity of the water leaving the wheel. If the area for discharging this water was too small, we had doubts in being able to get rid of the water and develop enough power on the tool. We also had to take into consideration the strength of the machine, which had to be strong enough to provide an internal support for the bushing without affecting the water flow. For instance, if the area of the hole in one case was 50 per cent. as great as it would be in another case, then the loss would be four times as great with the small opening, as compared with the larger opening, and consequently more water would have to be used to do a given amount of work; and at that time objections were being made to the amount of water used with our older types of machines. We also realized that the support for the bearing for the front part of the shaft must be such as to withstand any vibration, and at the same time enable us to force the bushing in under pressure sufficiently high to hold it in without the use of threads, set screws, etc., as we had found that the use of

a screw was a thing to be avoided in the manufacture of a tube cleaner motor. It was for these reasons, then, that we finally adopted the two thin webs, as thin as we could make them and secure proper strength for supporting the bushing; and while theoretically we would have some loss due to frictional discharge even with these thin webs, yet the loss would not be as great as if we used webs not longitudinal, but provided with the same strength. In fact, as I remember it, had we used the common form of web or spider, the loss in frictional discharge would have made the machine impracticable. We were at this time compelled to use a very much higher water pressure than we did in the older days. When we first started to build water motors, it was hard to get 100 pounds of water pressure to operate it with; whereas in 1904 we were called upon to furnish machines to operate with from 150 to 300 and 400 pounds pressure, and to-day 200 pounds is very common. At the time the first double bush-bearing machine was built, it was put into operation on a plant having in the neighborhood of 400 pounds pressure to operate it, and this pressure was used. As the energy utilized on a water motor is proportional to the square of the velocity leaving it, it is apparent, as I have already indicated, that a very large opening must be provided to get rid of the water after it leaves the wheel; and when you put 400 pounds hydrostatic pressure on one of these motors, or 250 pounds, for that matter, a very much larger amount of water would enter the wheel than would be the case if only 100 pounds were used. All of these facts influenced us in the development of the longitudinal webs, and the making of the shell and front support of the machine of an integral piece, or making it in such way that the vibration would not destroy the support of the bushing."

These features of a one-part frame and a long-shaft bearing, or an integral frame, were embodied in principal patent No. 874,174, and in No. 983,032, a divisional application of No. 874,174. In their specification of No. 874,174 the patentees describe their invention as follows:

"The object of the invention is to provide a simple and efficient turbine and shaft which will be longer lived than formerly, and in which the shocks upon the cutting head are largely absorbed or cushioned before they can reach the turbine wheel. Heretofore in this class of devices, when used in connection with cutting heads, the shocks and jars upon the head have caused rapid deterioration of the turbine driving device, making the turbine short-lived. Our invention greatly reduces this difficulty, and consists in the construction and arrangement of parts as hereinafter more fully described and claimed.

"In the drawings, referring to the form of Figs. 1, 2, and 3, 2 represents

the cylindrical turbine casing having an inner concentric shell *3*, which is preferably cast integrally with the casing to which it is connected by the opposite webs or ribs *4* and *5* as shown in Fig. 3. Within the inner shell *3* we preferably place a bushing or lining *6* having a rear shouldered portion *7* which fits against the rear end of the inner shell, this shell being shorter than the casing, and projecting beyond the front end of the casing in this form. Within the bushing *6* fits the turbine shaft *8*, the rear end of which is screwed or otherwise secured to the turbine wheel *9*. This turbine wheel is preferably provided with a circular recess in its front portion, forming an angular flange *10* within which is seated the ring *11* of lignum vitæ. This lignum vitæ bears against a ring *12* which fits against the rear end of the shoulder of the bushing. At the rear end of the turbine wheel it is provided with a shallow circular recess containing a plate *13* fitting upon a circular lignum vitæ block *14*, which is fitted into a recess in the stationary portion *15* of the turbine. This stationary portion *15* is provided with the usual ports *16* and is preferably of ring form, fitting against a shoulder *17* in the rear end portion of the casing, and pressed against said shoulder by the screw coupling *18* which is secured into the rear end of the casing. The bushing *6* is held against rotation by any suitable means, such as the screw *19* extending through one of the webs and entering a hole in the bushing, or it may be pressed in. * * *

"The advantages of my invention result from the simplicity and solidity of the construction. A long outbored bearing is provided between the external tool and the turbine wheel, which cushions the jars and shocks, thus greatly saving the wear of the turbine. The thrust bearings absorb the end thrust of the shaft, and the lignum vitæ and metal washers are long-lived and give little friction. The oiling device affords a steady supply of oil to the long shaft bearing, and the device is compact and strong. The washers may be metal or wood, and may be varied in size, shape, and number."

This device resulted in making the casing from a single solid piece of forged steel by so "hogging" it out as to leave integral, radial webs which, when properly bushed, furnished a long bearing for the shaft. At the same time, by making these webs long and narrow, they secured by such length adequate strength to support the bearing without making the webs so wide as to interfere with the needed free-water outlet. As to the vital character of these long narrow webs the proof as quoted above is:

"Had we used the common form of web or spider, the loss in frictional discharge would have made the machine impracticable."

On this device were granted, inter alia, the claims here involved, viz.:

"1. In a turbine, a barrel or casing having inwardly projecting longitudinal webs integral therewith, and a removable bushing or bearing supported by said webs, substantially as described.

"2. In a turbine, a barrel or casing having inwardly projecting longitudinal webs integral therewith, a removable bushing or bearing supported by said webs, and a movable turbine member in the rear of the webs having a shaft extending through the bushing, substantially as described.

"3. In a turbine, a barrel or casing having inwardly projecting longitudinal webs supporting a bearing, said bearing having a removable bushing, substantially as described.

"4. In a turbine, a barrel or casing having inwardly projecting longitudinal webs supporting a bearing, said bearing having a removable bushing, and a movable turbine member in the rear of the webs having a shaft extending forwardly within the removable bushing, substantially as described.

"5. In a turbine, a barrel or casing having inwardly projecting integral webs supporting a bearing, said bearing having a removable bushing, a movable turbine member having a forwardly extending shaft within the re-

movable bushing, and means for lubricating said shaft, substantially as described.

"6. In a turbine, a barrel or casing having inwardly projecting webs supporting a bearing, a removable bushing in said bearing, a rear turbine wheel having a shaft extending forwardly within the bushing, and supply channels arranged to supply a lubricant to the shaft, substantially as described.

"7. In a turbine, a barrel or casing having inwardly projecting webs supporting a bearing, a removable bushing for said bearing, a turbine wheel having a forwardly projecting shaft within the bushing, a stationary turbine member secured within the casing at the rear of the turbine wheel, and rear nozzle or supply chamber secured at the rear end of the casing, substantially as described."

"16. A turbine having a casing with inwardly extending radial webs.for a part of its length, a removable bushing carried by the webs, a turbine shaft fitting within the bushing, a turbine wheel in the rear of the radial webs, and a removable stationary turbine portion clamped against a casing shoulder in the rear of the turbine wheel, substantially as described."

"20. A turbine having a casing with integral inwardly projecting webs or ribs extending for a part only of its length, a removable concentric bushing supported by the ribs or webs, and a turbine at the rear of the bushing and having a shaft fitted therein, said parts having a feed channel to supply a lubricant to the shaft, substantially as described."

It will be noted that the above drawing and the quoted specification described a device with a long bearing, integral with the casing, located in front of the motor wheel and which was the only bearing the shaft had. For, as stated in the part quoted:

"Within the bushing 6 fits the turbine shaft 8, *the rear end of which is screwed or otherwise* secured to the turbine wheel 9."

In addition, however, a device similar to the above, but with a second and rear bearing is also illustrated in Figs. 4, 5, 6, and 7, wherein the shaft is carried through and to the rear of the wheel and has another bearing in the stationary part of the motor. As to this device the specification says:

"I do not claim herein specifically the forms of Figs. 4, 5, 6, and 7, as the same are pending in another copending application, No. 350,246, filed December 31, 1906."

This latter application was embodied in patent No. 983,032. The two patents, therefore, while divided in prosecution, together constitute one general subject-matter. The specification of this second patent, which, as we have said, shows both a forward and rear bearing for the shaft, states:

"The advantages of the invention result from the simplicity, strength and long life of the structure. A long outbored bearing is provided between the external tool and the turbine wheel, which cushions the jars and shocks, thus saving wear on the turbine. The extending of the shaft within or through the stationary member and the providing of bearings in front of and in the rear of the turbine wheel gives a strong and efficient bearing construction, especially in connection with the long outbored bearing."

Without entering into a full description, it suffices to say that in this construction the front shaft bearing, instead of being extended through substantially the whole length of the shell as shown in Fig. 1 of pat-

ent No. 874,174, is here shortened to the length shown at 7 in Fig. 1 of No. 983,032, while the rear reduced portion 17 of such shaft extends back so as to have a rear bearing, or, as the specification says:

"A thrust bearing is thus provided for the shaft on both sides of the stationary turbine portion."

It will be apparent that the heavy leverage action on the shaft, when subjected to the intense lateral strain imparted at high speed, would tend to make the shaft cant or wabble to some extent, even when it was sustained by a long bearing. It will therefore be evident that giving the shaft a second and rear bearing would tend to further distribute the strain and stabilize the shaft. In this regard the patentees are warranted in saying as they do in the specification:

"The extending of the shaft within or through the stationary member, and the providing of bearings in front of and in the rear of the turbine wheel gives a strong and efficient bearing construction, especially in connection with the long outbored bearing."

This second or rearward bearing gave a dual shaft bearing to the art, and this element, together with the locking of the stationary turbine member, which carried the rear bearing in fixed relation to the shell which carried the front bearing, made the structure, as a whole, a practically solid body and its two bearings practically immobile. The device by which these two bearing agencies were locked to each other by a third member constitutes another element of interrelated combination. By referring to Fig. 1 herewith shown it will

Fig. 1.

No. 983,032

be seen that coupled to the hose which supplies the motive power to the motors is the rear supply chamber 13. This latter member is not directly subjected to the shaft thrust or bearing pressure. The vibratory motion to which it is subjected is simply the structural vibration of the whole mechanism and not the thrust strain imparted by a direct attachment to the bearing. The significance of this is shown by the testimony. In the experimenting to which we have referred the hose coupling was screwed up against the rear bearing, which was stationed in the stationary part. It is apparent that this combination subjected the hose screw connection to the direct thrust of the shaft on the bearing. The coupling, therefore, instead of being an independ-

ent lock, was in effect but a dependent part of the bearing. Referring to such a device, Elliott, one of the patentees, testified:

"We decided that the first machine of this type which we would build would utilize the principle of applying the hose coupling as a lock nut. Therefore, in the first machine built the rear bearing was journaled in the stationary part behind the wheel and held in place by screwing the hose coupling up against it. We found, however, that this was only a partial solution of the trouble, as the vibration of the rear end of the shaft bearing against this stationary part or nozzle piece, caused the hose coupling to work loose."

This difficulty was overcome by screwing the nozzle coupling *13* into the rear end of the casing, and against, but not to, the stationary turbine member *14*, which latter has also a smooth outer surface which fits against shoulder *15* of the casing. By this construction, and such connection to the casing, the nozzle is not subjected to direct shaft thrust, but serves as a fixed nut lock and holds the rear bearing stable. This member *13*, while serving to hold the motor and rear bearing in place for working conditions, may also be detached and permit the motor being taken out through the rear of the shell. This device was embodied in claim 1, which reads as follows:

"1. A rotary motor having a casing, a revoluble motor element therein, a shaft carrying said motor element and projecting forwardly and rearwardly therefrom, a bearing member carried by the casing for the forwardly projecting portion of the shaft, a ported admission member removably secured in the rear portion of the casing and carrying a bearing for the rearwardly projecting portion of the shaft, and a hollow inlet member detachably connected with the casing and engaging the admission member to normally retain it against rearward movement, substantially as described"

—and in various combinations in the other claims here involved, viz., 4, 5, 6, 7, 9, 11, 13, 15, 16, 22, 23, 30, and 31 to 41, inclusive.

We are therefore of opinion the devices described in the several claims of these two patents here in issue were novel, useful, and inventive. We further find they are embodied in the defendant's device.

[2] It remains to consider the third patent, No. 983,034, one of the devices of which is shown in the accompanying patent Figs. 1 and 2:

The motor is an air motor, not a turbine, anl is actuated by air or other motive fluid acting on the piston blade *10*. In adapting solid piece casings, such as we considered in the former patents, to use in an air motor with a revolving blade, such as here shown, it is apparent that, to prevent pressed air escape, there must be an accurate angle between the inner surface of the front cylinder head and that of the cylinder wall, in order that such angle should properly coact with a corresponding angle on the blade  To mechanically make such angle in the inside of the front head of the solid shell was difficult, if not, indeed, impossible. It was also important that the cylinder walls and head be internally hardened to meet the wear caused by the rapid traveling blades. These difficulties were met and overcome by the device of patent No. 983,034 here in suit. Without entering into minute details, we may say that Elliott's device consists substantially in building up from the open, rearward end of a solid outer shell, provided with an integral front head, an inner cylinder composed of parts already hardened and which when put in place were locked in place and formed an angle which accurately fitted that of the blade. In Fig. 1 the solid, one-piece outer shell with a head adapted for a forward shaft bearing is numbered *2*. The bushing of the front bearing is numbered *6* and its flange, numbered *8*, right angles so as to seat forwardly against shoulder *9* of head *3*. Against this bushing flange is placed the circular, hardened disk *12*. This disk is introduced from the rear, open end of the shell and forms the front end of the cylinder. Abutting against the periphery edge of this disk is the hardened, inner cylinder *11* which is also introduced from the rear, open end of the outer shell, and is locked against rotation by numbers *30* and *31* in Fig. 2. Against the rear end of cylinder wall *11* a rear end or head is built up by the hardened, circular plate or disk *13*, introduced from the rear, open end of the outer shell. This latter head is seated against the flange *14* of bushing *7*, which latter surrounds the rear bearing *18* of the motor shaft. In this manner an accurate angle is formed by the junction of cylinder wall *11* and end plate *13* to coact with a corresponding angle on blade *10*. The end bushing *7*, abutting at its front end against shoulder *18*, and at its rear end against shoulder *17* of the reduced section of shaft *5*, tends to prevent shaft-play in either direction. The inner cylinder and other parts of the mechanism are locked in place by the device referred to in patent No. 983,032, and the whole forms a unitary, co-operating combination. The device, as embodied in claims 10, 11, 13, 14, and 15,[1] we find to be novel and useful and to involve invention.

[1] "10. In a portable rotary motor, a portable outer casing having an integral head at its forward end, and open at the rear end, a motor cylinder removably seated in said casing and removable through the open rear end, means for holding the cylinder from rotary movement within the casing, a motor shaft having a forward bearing in the integral head, a motor element connected to said shaft, and a removable bearing and admission member having a bearing for the rear end of the shaft, said shaft, motor element and rear bearing all being removable through the rear end of the casing, together with means

Without describing the defendant's motors in detail, it suffices to say we find they infringe the claims in issue on these several patents.

The decree below will therefore be set aside, and the case remanded, with instructions to enter a decree adjudging the several claims of patents Nos. 874,174, 983,032, and 983,034, here in issue, valid and infringed.

for normally securing said parts against endwise rearward movement, substantially as described.

"11. A rotary motor comprising an outer casing or shell having an integral head at one end carrying a shaft bearing, said shell being open at the other end, a cylinder inserted in the casing from the open end thereof and secured against rotation, a stationary ported admission member inserted through the open rear end of the outer casing, and a rotary motor element within the cylinder, substantially as described."

"13. A rotary motor comprising an outer portable casing or shell having a bush bearing carried at one end thereof, and of smaller diameter than the casing, said shell being open at the other end, a cylinder inserted in the casing from the open end thereof and secured against rotation, a stationary ported admission member inserted through the open rear end of the outer casing, means for securing said member in place, and a rotary motor element within the cylinder.

"14. A rotary motor, comprising an outer casing or shell open at one end and having an integral head at the opposite end provided with a shaft bearing therein, an open-end cylinder removably seated in said casing or shell, a removable head within the opposite end portion of the casing or shell, and also having a shaft bearing, a securing member engaging the removable head and holding it in place, and a piston shaft journaled in said heads and carrying a piston blade, said cylinder, removable head and piston shaft and blade being all removable through the open end of the casing or shell when the securing member is removed.

"15. A rotary motor comprising an outer casing or shell having an integral head at one end carrying a shaft bearing, said shell being open at the other end, a cylinder inserted in the casing from the open end thereof and secured against rotation, a stationary ported admission member inserted through the open rear end of the outer casing, a rotary motor element within the cylinder, and means for locking the stationary ported admission member in place."